United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL CHAVEZ, et al.,<br><br>Defendants. | Case No. 15-CR-00285-LHK-1<br><br>**ORDER DENYING MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE MAY 22, 2011 AND AUGUST 19, 2012 SEARCHES OF CHAVEZ'S RESIDENCE**<br><br>Re: Dkt. No. 771 |

Defendant Daniel Chavez ("Chavez") moves to suppress evidence obtained directly or indirectly from searches of his residence conducted on May 22, 2011 and August 19, 2012. ECF No. 771. Having considered the filings of the parties, the relevant law, and the record in this case, the Court DENIES Chavez's motion to suppress.

## I.      BACKGROUND

### A. Factual Background

On March 25, 2011, a state court sentenced Chavez for a driving on a suspended or revoked license-DUI misdemeanor to 60 days in County Jail with 30 days suspended. Ex. 5 at 1-

2.[1]  The state court also sentenced Chavez to a conditional probation term of three years.  *Id.* at 1-2.  Chavez accepted the terms of his probation.  *Id.* at 2.

The state court recommended Chavez serve his 30 days in a Work Alternative Program, though Chavez appears to have served his time in home confinement.  *Id.* at 2; Ex. 4.  On April 29, 2011, Chavez signed a home confinement participant agreement that set forth the terms of his home confinement.  Ex. 4.  Chavez agreed to "obey all laws" and to "not associate with anybody on Probation or Parole."  *Id.* ¶¶ 8, 19.  Chavez also agreed to a search condition that stated the following: "I [Chavez] consent to the search and seizure of my person, property, residence, vehicle, and any areas under my control, without a search warrant or probable cause, night or day, by any Probation Officer or any Peace Officer."  *Id.* ¶ 23.

On May 22, 2011, Salinas Police Officers Justin Salinas and Anthony Parker observed a vehicle parked in the driveway of Chavez's residence.  Ex. 3 at 2.  The officers determined that the vehicle was registered to the girlfriend of Victor Skates.  Ex. 3 at 2; Ex. 6 at 1.  The Salinas Police Department had been actively searching for Skates, who had an outstanding arrest warrant for armed robbery at the time.  *Id.*

Officer Gerry Magana arrived on scene shortly thereafter and continued officers' surveillance of Chavez's residence.  Ex. 3 at 2.  Officer Magana observed Eder Torres, a known parolee with gang affiliations, inside Chavez's garage interacting with Chavez.[2]  Ex. 6 at 1; Ex. 7 at 1-2.  At the time of the May 22, 2011 surveillance, Chavez was still serving his home confinement sentence.  Ex. 5 at 2.  As previously noted, Chavez's home confinement participant agreement prohibited Chavez from associating with anyone on probation or parole.  Ex. 4 ¶ 19.  As a result, officers concluded that Chavez was violating the terms of his home confinement agreement by associating with Torres.

On the evening of May 22, 2011, officers from the Salinas Police Department's Violence

---

[1] All references to Exhibits are to the exhibits of the Lane Declaration, which was filed under seal.
[2] Indeed, Chavez, Skates, and Torres were known gang members at this time.  Ex. 3 at 2.

Suppression Unit arrived at Chavez's residence to search the residence and arrest Chavez. Ex. 7 at 1. Officers surrounded Chavez's residence and announced their presence. Ex. 3 at 3. Officers then observed Chavez and his fiancée running up and down the stairs and heard loud banging sounds from Chavez's residence. *Id.* On this basis, officers believed that Chavez and his fiancée were attempting to conceal or destroy incriminating evidence. *Id.*

Shortly thereafter, Chavez, his fiancée, their two children, and a laborer who was working on the house exited the residence. Ex. 3 at 3. Chavez was arrested and officers conducted a warrantless search of Chavez's residence pursuant to the terms of Chavez's home confinement participant agreement. *Id.* As previously noted, Chavez had agreed to a search condition in his home confinement participant agreement, which stated, "I [Chavez] consent to the search and seizure of my person, property, residence, vehicle, and any areas under my control, without a search warrant or probable cause, night or day, by any Probation Officer or any Peace Officer." Ex. 4 ¶ 23. The address that officers searched on May 22, 2011 was specifically identified as Chavez's residence in Chavez's home confinement participant agreement. *Id.* ¶ 5; Ex. 3 at 2; Ex. 6 at 1.

The search of Chavez's residence uncovered an operable police radio scanner, over a dozen men's rings, a cracked cell phone, financial documentation demonstrating unexplained wealth, and other evidence. Ex. 3 at 3; Ex. 7 at 2-4.

In June 2011, Detective James Knowlton of the Salinas Police Department investigated the origins of the men's rings found in Chavez's residence from the May 22, 2011 search. Ex. 8. Detective Knowlton determined that at least one of the rings was stolen from an armed robbery of a jewelry store in 2009. *Id.* at 5-6. On June 15, 2011, Chavez was arrested for possession of stolen property. Ex. 9 at 3.

On January 11, 2012, Chavez was convicted for possession of stolen property with gang enhancements. Ex. 13. Chavez was sentenced to 270 days in jail and three years of formal probation. *Id.* at 1-2. As a condition of his probation, Chavez agreed to "[o]bey all laws" and to

3

"[n]ot associate with any individuals you know, reasonably should know, or are told by the Probation Officer to be gang members, or on any form of probation or parole supervision." *Id.* at 1-2. Additionally, Chavez was subject to a probationary search condition that required him to "[p]ermit the search of [his] person, car, personal effects, or place of residence, night or day, without the necessity of a search warrant, at the direction of the Probation Officer or any peace officer." *Id.* at 2. Chavez "accept[ed] [these] terms of probation. *Id.*

On August 19, 2012, Officers Magana and Salinas observed another vehicle parked in the driveway of Chavez's residence. Ex.11 at 1-2. That vehicle was occasionally driven by a documented gang member. *Id.* at 2. Officers conducted a registration check and confirmed that the vehicle was registered to a relative of the documented gang member. *Id.* Based on this, an officer believed that the documented gang member could have been inside Chavez's residence interacting with Chavez, which would have been a violation of Chavez's probation condition prohibiting him from associating with gang members. *Id.* Unlike the May 22, 2011 surveillance, however, officers did not witness Chavez interacting with anyone. *Id.*

Officers next observed Chavez's fiancée leaving the residence. *Id.* Officers conducted a traffic stop of Chavez's fiancée, and during the encounter, officers witnessed Chavez's fiancée placing a call shortly before she was pulled over by marked police vehicles. *Id.* A short time after, officers conducted a search of Chavez's residence pursuant to the terms of Chavez's probationary search condition from his January 11, 2012 conviction for possession of stolen property with gang enhancements. *Id.* at 2-3. Officer Salinas explained to Chavez that he was not under arrest and that officers were simply conducting a probationary search. *Id.* at 3. Officer Salinas asked Chavez about the vehicle parked in his driveway, and Chavez disclaimed knowledge of the vehicle. *Id.*

The August 19, 2012 search of Chavez's residence revealed three large flat screen televisions and a Sony PlayStation 3 video game console. *Id.* All these items were missing their serial numbers. *Id.* On August 19, 2012, Chavez was on probation for possession of stolen

4

property with gang enhancements.  *Id.*  As a result, Officer Salinas believed that Chavez was again possessing stolen property.  *Id.*  The televisions and the Sony PlayStation 3 video game console were seized as evidence, along with a number of cell phones.  Ex. 11 at 4; Ex. 12 at 1-2.

### B. Procedural History

On November 13, 2019, Chavez filed a motion to suppress evidence obtained directly or indirectly from the May 22, 2011 and August 19, 2012 searches of his residence.  ECF No. 771 ("MTS").  The government filed an opposition brief on December 6, 2019.  ECF No. 785 ("Opp.").  Chavez filed a reply on December 27, 2019.  ECF No. 797 ("Reply").

## II.  DISCUSSION

### A. Fourth Amendment Standard For Probationer and Parolee Searches

When analyzing the constitutionality of a probationer or parolee search, the Court must "examine the totality of the circumstances."  *United States v. King*, 736 F.3d 805, 808 (9th Cir. 2013).  "To do so, we must assess, on the one hand, the degree to which the search intrudes upon Defendant's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."  *Id.* (quotation marks and internal alterations omitted).

### 1.  A Defendant's Privacy Interests

A defendant's status as a parolee or probationer is an important factor in the Court's analysis.  *United States v. Knights*, 534 U.S. 112, 119 (2001) ("[S]tatus as a probationer subject to a search condition informs both sides of [the Fourth Amendment] balance.").  The United States Supreme Court has held that probationers have a lower expectation of privacy than that enjoyed by a citizen who is not subject to a criminal sanction because "the very assumption of the institution of probation is that the probationer is more likely than the ordinary citizen to violate the law."  *Id.* at 119-120.

For a defendant on parole, however, the United States Supreme Court explained that parolees are entitled to even "fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment."  *Samson v. California*, 547 U.S.

843, 850 (2006). This is "primarily because the State has a stronger interest in supervising parolees than it does probationers, given the more serious nature of offenses parolees have committed and the more serious risk of recidivism they pose." *United States v. Cervantes*, 859 F.3d 1175, 1180 (9th Cir. 2017), *as amended on denial of reh'g and reh'g en banc* (Sept. 12, 2017). This distinction between probation and parole "could prove important," as the Ninth Circuit has held that "warrantless, suspicionless searches of a parolee's residence . . . can be reasonable if the search is authorized by the terms of the parolee's search condition." *Id.* With respect to probationers, the Ninth Circuit has held the same as to probationers who committed violent felonies, but did "not decide whether the Fourth Amendment permits suspicionless searches of . . . lower level offenders who have accepted a suspicionless-search condition." *King*, 736 F.3d at 810. Additionally, the Ninth Circuit has held that courts are to treat "mandatory supervision [as] more akin to parole than probation," and therefore, cases involving mandatory supervision are "governed by the line of precedent applicable to parolees." *Id.* at 1181.

In addition to a defendant's status as a probationer or parolee, "the probation [or parole] search condition is a salient circumstance." *King*, 736 F.3d at 808 (quoting *Knights*, 534 U.S. at 118). The United States Supreme Court has repeatedly held that "acceptance of a clear and unambiguous search condition 'significantly diminishe[s] [a defendant's] reasonable expectation of privacy.'" *Samson*, 547 U.S. at 852 (quoting *Knights*, 534 U.S. at 120). A parolee with a plain and unambiguous parole search condition "d[oes] not have an expectation of privacy that society would recognize as legitimate." *Id.* at 853. A probationer with an analogous search condition "has a greater expectation of privacy than does a parolee," but that expectation of privacy may still be "small." *King*, 734 F.3d at 809.

## 2. The Government's Interests

On the other side of the ledger, the government has several important and legitimate interests. First, "the state has an interest in 'apprehending violators of the criminal law, thereby protecting potential victims'" from recidivism. *King*, 736 F.3d at 809.

6

Second, the state has an interest in "discovering criminal activity and preventing the destruction of evidence." *Id.* Probationers and parolees alike have "even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal" because they are "subject to supervision and face revocation," and often, as is the case here, "agree[] to a search condition that permits warrantless, suspicionless searches." *Id.* (quotation marks omitted).

Third, the state has an interest in a parolee or probationer's reintegration into society. "The Supreme Court has observed that, by reducing recidivism, a state's 'ability to conduct suspicionless searches of parolees . . . aids, rather than hinders, the reintegration of parolees into productive society.' That statement is true of probationers as well." *Id.* (quoting *Samson*, 547 U.S. at 854).

The Court now considers each side of the balance. The Court begins by analyzing the May 22, 2011 search before turning to the August 19, 2012 search.

**B. The May 22, 2011 Search**

**1. Chavez's Privacy Interests**

For a defendant on parole, the United States Supreme Court has explained that parolees are entitled to even "fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Samson v. California*, 547 U.S. 843, 850 (2006). Although home confinement may be somewhat akin to imprisonment, Chavez was sentenced to a three-year term of probation for a driving on a suspended or revoked license-DUI misdemeanor. Thus, the Court analyzes Chavez's privacy interests as a probationer.

"Under California law, a sentence of probation is considered an act of clemency available only when the court determines the mitigating facts relating to the defendant's crime or background warrant withholding the punishment otherwise prescribed by law." *Cervantes*, 859 F.3d at 1181. Therefore, Chavez's privacy interests at the time of the May 22, 2011 search were weaker compared to a citizen not subject to criminal sanction. At the same time, the Court notes

7

that Chavez's underlying crime was not "particularly serious" and that therefore, Chavez's privacy interest was still somewhat "substantial." *See United States v. Lara*, 815 F.3d 605, 610 (9th Cir. 2016) (quotation marks omitted).

The next step for assessing Chavez's privacy interest depends on Chavez's "acceptance of a clear and unambiguous search condition." *Samson*, 547 U.S. at 852. Acceptance of such a search condition "'significantly diminishe[s] [a defendant's] reasonable expectation of privacy.'" *Id.* (quoting *Knights*, 534 U.S. at 120).

The United States Supreme Court has repeatedly held that "acceptance of a clear and unambiguous search condition 'significantly diminishe[s] [a defendant's] reasonable expectation of privacy.'" *Samson*, 547 U.S. at 852 (quoting *Knights*, 534 U.S. at 120). A parolee with a plain and unambiguous parole search condition "d[oes] not have an expectation of privacy that society would recognize as legitimate." *Id.* at 853. A probationer with an analogous search condition "has a greater expectation of privacy than does a parolee," but that expectation of privacy can still be "small." *King*, 734 F.3d at 809.

In the instant case, on March 25, 2011, a state court sentenced Chavez for a driving on a suspended or revoked license-DUI misdemeanor to 60 days in County Jail with 30 days suspended. Ex. 5 at 1-2. The state court also sentenced Chavez to a conditional probation term of three years. *Id.* at 1-2. Chavez accepted the terms of his probation. *Id.* at 2.

The state court recommended Chavez serve his 30 days in a Work Alternative Program, though Chavez appears to have served his time in home confinement. *Id.* at 2; Ex. 4. On April 29, 2011, Chavez signed a home confinement participant agreement that set forth the terms of his home confinement. Ex. 4. Chavez agreed to "obey all laws" and to "not associate with anybody on Probation or Parole." *Id.* ¶¶ 8, 19. Chavez also agreed to a search condition that stated the following: "I [Chavez] consent to the search and seizure of my person, property, residence, vehicle, and any areas under my control, without a search warrant or probable cause, night or day, by any Probation Officer or any Peace Officer." *Id.* ¶ 23.

United States District Court
Northern District of California

In *King*, the Ninth Circuit held that a defendant's legitimate expectation of privacy was "small" when, among other things, he agreed to a probation search condition that stated that "Defendant is subject to a warrantless search condition, as to defendant's person, property, premises and vehicle, any time of the day or night, *with or without probable cause,* by any peace, parole or probation officer." 736 F.3d at 806, 809. The Ninth Circuit held that this search condition clearly and unambiguously put the defendant on notice of the possibility of a suspicionless search of his residence. *Id.* at 806. The search condition in *King* is indistinguishable from the one at issue here, and accordingly, the Court holds that Chavez was on notice of the possibility of a search similar to the one conducted by officers in this case.

Accordingly, the search condition "significantly diminished" Chavez's already "lower expectation of privacy," given Chavez's status as a probationer. *Id.* The search here was clearly within the bounds of this unambiguous search condition, as officers were permitted to conduct a suspicionless search of Chavez's property or residence. Again, the Court notes that Chavez's underlying crime that placed him on home confinement was not violent such that Chavez had a higher expectation of privacy than a defendant with a "serious and intimate . . . underlying conviction." *King*, 736 F.3d at 809. Examining the totality of the circumstances, however, the search conducted on May 22, 2011 was still a relatively minor intrusion into Chavez's legitimate expectation of privacy.

## 2. The Government's Interests

On the other side of the balance, the governmental interests at stake in the instant case are compelling. The strength of the governmental interest in conducting a search of a probationer "varies depending on the degree to which the government has a specific reason to suspect that a particular probationer is reoffending or otherwise jeopardizing his reintegration into the community." *Lara*, 815 F.3d at 612. Here, the government had specific reasons to suspect that Chavez was reoffending, jeopardizing his reintegration into the community, and potentially destroying incriminating evidence.

Under applicable case law, the strength of the governmental interests in preventing Chavez's recidivism and facilitating his reintegration into society are compelling and substantial. In *Knights*, the officers had evidence that Knights had vandalized and committed arson, with damages totaling approximately $1.5 million. 534 U.S. at 114. In *King*, the officers had suspicions that defendant was involved in a homicide. 736 F.3d at 806. In both cases, based on the severity of the crimes at issue, the government was determined to possess strong interests in conducting the relevant searches.

Here, the same is true in light of officers observing Chavez violating his home confinement participant agreement by interacting with a parolee with gang affiliations. As part of his probation, Chavez agreed to "not associate with anybody on Probation or Parole." Ex. 4 ¶ 19. But on May 22, 2011—the day of the search—police officers witnessed firsthand Chavez violating his home confinement agreement by associating with an individual on parole. Specifically, officers witnessed Chavez interacting with Torres in Chavez's garage. Ex. 3 at 2; Ex. 6 at 1. At that time, Torres was a parolee. Ex. 3 at 2. Chavez's interaction with Torres clearly violated the terms of Chavez's home confinement participant agreement. Ex. 4 ¶ 19.

Furthermore, officers were already investigating Chavez for his possible involvement in various gang-related murders and robberies. Ex. 7 at 2. Moreover, Chavez and Torres were known gang members at this time, and Torres had recently been arrested for violating the terms of his parole by associating with another known gang member. Additionally, on May 22, 2011, officers observed that a car parked in Chavez's driveway belonged to the girlfriend of Skates, a known gang member whom police officers were investigating. Ex. 3 at 2; Ex. 6 at 1. Indeed, Skates had an outstanding arrest warrant for armed robbery at the time. *Id.* The possibility that Chavez was interacting with Skates—and the fact that officers witnessed Chavez interacting with Torres—are important because at the time of the May 22, 2011 search, Chavez was under investigation for various gang-related murders and robberies. Ex. 7 at 2. These facts demonstrate the compelling nature of the government's interest in deterring not only additional violations of

United States District Court
Northern District of California

Chavez's home confinement participant agreement but possibly more serious, gang-related violent crimes. Additionally, the Government had a significant interest in facilitating Chavez's reintegration into society by preventing him from interacting with parolees or those with gang affiliations.

Finally, the May 22, 2011 search also served the government's interest in preventing Chavez and others in the home from destroying or concealing incriminating evidence. *See Knights*, 534 U.S. at 120 ("[P]robationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation . . . ."). After officers announced themselves to Chavez, officers observed Chavez and his fiancée moving about their home in what officers believed were attempts to conceal and destroy evidence. Ex. 3 at 3. Thus, in addition to preventing recidivism and facilitating Chavez's reintegration into society, the government's May 22, 2011 search served the important governmental "interest in discovering criminal activity and preventing the destruction of evidence." *King*, 736 F.3d at 809.

In short, the government had numerous significant and weighty interests in conducting a search of Chavez's residence on May 22, 2011.

### 3. Balancing Chavez's Privacy Interests Against the Government's Interests

Balancing the relatively minor intrusion on Chavez's expectation of privacy against the government's significant and weighty interests, the Court holds that the May 22, 2011 search was reasonable under the Fourth Amendment.

The Court acknowledges that the Ninth Circuit held in *Lara* that searches of nonviolent probationers may be constitutionally unreasonable. 815 F.3d at 612. However, *Lara* is distinguishable. In *Lara*, the defendant agreed to "submit his person and property, including any residence, premises, container or vehicle under his control to search and seizure." *Id.* at 610 (internal alterations omitted). The Ninth Circuit held that a search of defendant's cell phone did not neatly fall within this search condition because "[n]one of [the search condition's terms]—in

United States District Court
Northern District of California

particular, neither 'container' nor 'property'—clearly or unambiguously encompasses [a] cell phone and the information contained therein." *Id.* In other words, it was not evident that the defendant "clearly and unambiguously consented to the cell phone search at issue." *Id.* at 612.

This fact was particularly salient in *Lara* because a "search of a person's cell phone can 'typically expose . . . . far *more* than the most exhaustive search of a house,' as modern cell phones contain '[t]he sum of an individual's private life.'" *United States v. Johnson*, 875 F.3d 1265, 1274 (9th Cir. 2017) (quoting *Riley v. California*, 573 U.S. 373, 394, 396, (2014)). Indeed, in a subsequent decision, the Ninth Circuit clarified that "*Riley*'s emphasis on the almost *sui generis* nature of cell phones weighed heavily in *Lara*." *Id.* As a result, the *Lara* defendant's privacy interests were "substantial" and counseled in favor of granting suppression. *Lara*, 825 F.3d at 612.

Additionally, the government's interest in combating recidivism was weaker in *Lara* than it is here. In *Lara*, the defendant "had merely missed a meeting with his probation officer." *Id.* As the Ninth Circuit acknowledged, "Lara's noncompliance was worlds away from the suspected crimes that prompted the searches in *King* and *Knights*," where the suspects were suspected of murder and arson. *Id.* at 612. The same is true here, as officers observed Chavez violating the terms of his home confinement participant agreement by associating with a parolee with gang affiliations and suspected Chavez of participating in gang-related murders and robberies. Thus, *Lara* is entirely distinguishable because the government's interests in *Lara* were also far weaker than the government's interests in the instant case.

Indeed, this conclusion accords with another case out of the Southern District of California involving analogous facts. In *United States v. Cotton*, the court held that a probationary search pursuant to an unambiguous search condition was reasonable under the totality of the circumstances. 2018 WL 4599820 (S.D. Cal. Sept. 24, 2018). In *Cotton*, the defendant was also on probation for a nonviolent offense—petty theft—and was subject to a clear and unambiguous residential search condition. *See id.* at *7. In terms of the government's interests, the court noted

12

that "a video a mere four days prior to the search showed Defendant, a convicted felon, holding two handguns." *Id.* at *8. In other words, just as in the present case, officers had reason to believe that the defendant was reoffending.

Here, Chavez violated the terms of his home confinement agreement by associating with Torres, a parolee and known gang member who had recently been arrested for violating the terms of his parole by associating with another known gang member; officers had reason to believe that Chavez could be interacting with Skates, another known gang member who had an outstanding arrest warrant for armed robbery; and Chavez was also under investigation for his own possible involvement in various gang-related murders and robberies. On similar facts, the *Cotton* court explained that the defendant's privacy interests "[were] a far cry from those in *Lara*," while the government's interests were "more similar to [the government's interests in] *Knights* and *King* than to *Lara*, making the government's interest a weightier one in the balancing test." *Id.* at *7-8. That is precisely the same holding that the Court reaches here.

Chavez's arguments to the contrary are unpersuasive. Chavez mainly argues that the May 22, 2011 search exceeded its purported purpose. MTS at 8, 11. More specifically, Chavez asserts that officers could only search to determine whether any gang members or felons were present in the home and were required to cease their search once they concluded otherwise. Chavez is mistaken.

First, the scope of the search was in full compliance with the terms of the home confinement participant agreement. The search condition stated that "I [Chavez] consent to the search and seizure of my person, property, residence, vehicle, and any areas under my control, without a search warrant or probable cause, night or day, by any Probation Officer or any Peace Officer." In *Knights*, the United States Supreme Court rejected an argument similar to the one that Chavez raises here and explained that "[c]ertainly nothing in the condition of probation suggests that it was confined to [a particular type of search] and nothing more. The search condition . . . does not mention anything about purpose." 534 U.S. at 116. Indeed, the search condition at

Case No. 15-CR-00285-LHK-1
ORDER DENYING MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE MAY 22, 2011 AND AUGUST 19, 2012 SEARCHES OF CHAVEZ'S RESIDENCE

issue here explains that Chavez consented to a search "without a search warrant or probable cause"—that is, a suspicionless search. Ex. 4 ¶ 23; *King*, 736 F.3d at 806. Accordingly, Chavez's argument regarding the scope or purpose of the May 22, 2011 search fails.

Second, Chavez's argument is unpersuasive because Chavez mischaracterizes the government's interest in conducting the May 22, 2011 search. As noted previously, the search was not simply to determine whether any gang members or felons were present in Chavez's home. Officers had already observed Chavez violating his home confinement participant agreement by interacting with Torres, a parolee and known gang member. Furthermore, officers suspected that Chavez was involved in various gang-related murders and robberies. Finally, after the officers announced themselves, Chavez and his fiancée appeared to be hiding or destroying possibly incriminating evidence. The government's interest, therefore, was not confined to determining whether gang members or felons were present in Chavez's home. Rather, the government had a strong interest in investigating Chavez's possible involvement in gang-related murders and robberies.

As a result, the Court finds that given the totality of the circumstances and balancing the relatively minimal intrusion on Chavez's legitimate expectation of privacy against the government's compelling interests in conducting a probationary search, the May 22, 2011 search of Chavez's home was reasonable. The Court now addresses the August 19, 2012 search.

## C. The August 19, 2012 Search

Chavez's first argument is that he "was only on probation in August of 2012 as a result of the unconstitutional search of May 22, 2011," and therefore, his status as a probationer should not be considered in the Fourth Amendment analysis. Reply at 7. However, as the Court just held, the May 22, 2011 search complied with the Fourth Amendment under the totality of the circumstances. Therefore, Chavez's status as a probationer is relevant in analyzing whether the August 19, 2012 search was reasonable. The Court assesses Chavez's privacy interests, the government's interests, and then balances the two.

### 1. Chavez's Privacy Interests

The following facts are relevant to determining Chavez's privacy interests at the time of the August 19, 2012 search. As a result of the May 22, 2011 search, Chavez was convicted for possession of stolen property with gang enhancements. Ex. 13. Chavez was sentenced to 270 days in jail and three years of formal probation. *Id.* at 1-2. As a condition of his probation, Chavez agreed to" [o]bey all laws" and to "[n]ot associate with any individuals you know, reasonably should know, or are told by the Probation Officer to be gang members, or on any form of probation or parole supervision." *Id.* at 1-2. Additionally, Chavez was subject to a probationary search condition that required him to "[p]ermit the search of [his] person, car, personal effects, or place of residence, night or day, without the necessity of a search warrant, at the direction of the Probation Officer or any peace officer." *Id.* at 2. Chavez "accept[ed] [these] terms of probation, and was on probation at the time of the August 19, 2012 search. *Id.*

In determining Chavez's privacy interest in the instant case, the Court first assesses whether Chavez's privacy interest was diminished due to his status as a probationer. At the time of the August 19, 2012 search, Chavez was on probation based on a charge of possession of stolen property with gang enhancements. Ex. 13. The officers who conducted the search knew this fact. Ex. 11 at 3. Therefore, Chavez's privacy interests at the time of the August 19, 2012 search were weaker compared to a citizen not subject to criminal sanction.

Additionally, while Chavez's underlying offense of possession of property stolen in a jewelry store robbery was not necessarily violent,[3] the fact that Chavez received gang enhancements indicates that his offense was reasonably serious. Indeed, this crime was far more serious than Chavez's prior misdemeanor crime of driving with a suspended or revoked license-DUI—the crime that led to Chavez's home confinement participant agreement and provided a basis for the May 22, 2011 search. Therefore, Chavez's status as a probationer who committed a not necessarily violent but serious offense of possession of stolen property with gang

---

[3] The record for the instant motion does not identify Chavez's role in the robbery, if any, or whether the robbery was violent.

Case No. 15-CR-00285-LHK-1
ORDER DENYING MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE MAY 22, 2011 AND AUGUST 19, 2012 SEARCHES OF CHAVEZ'S RESIDENCE

enhancements counsels in favor of finding that Chavez's legitimate privacy interest was reasonably diminished.

The next step for assessing Chavez's privacy interest depends on Chavez's "acceptance of a clear and unambiguous search condition." *Samson*, 547 U.S. at 852. Acceptance of such a search condition "'significantly diminishe[s] [a defendant's] reasonable expectation of privacy.'" *Id*. (quoting *Knights*, 534 U.S. at 120).

At the time of the August 19, 2012 search, Chavez was clearly on probation and was subject to a search condition. Ex. 13. For the August 19, 2012 search, the government proffered the minute entry for Chavez's conviction for possession of stolen property with gang enhancements. *See* ECF No. 811 (explaining that "[t]he minute entry contains the terms of the term of probation, including the search condition and the no contact with gang members or persons on probation or parole, that were in effect at the time of the August 19, 2012 probation search at issue."). The minute entry for Chavez's conviction for possession of stolen property with gang enhancements notes that Chavez agreed to "[p]ermit the search of [his] person, car, personal effects, or place of residence, night or day, without the necessity of a search warrant, at the direction of the Probation Officer or any peace officer." Ex. 13 at 2.

The Ninth Circuit has held that "[t]he meaning of . . . a California term of probation is a question of state law." *King*, 736 F.3d at 806 n.3 (emphasis omitted). "Only after the meaning and scope of a search clause are determined, under state law, does the federal Fourth Amendment analysis begin." *Id.*

The Ninth Circuit has acknowledged that "[u]nder California law, Defendant's agreement to the warrantless search condition as part of his state-court probation was an agreement to be subject to suspicionless searches." *Id.* Therefore, the Court holds that Chavez's acceptance of warrantless search condition constituted acceptance of a "clear and unambiguous" probationary search condition that permitted a suspicionless search of his home. As a result, Chavez's legitimate expectation of privacy was "significantly diminished." *See Knights*, 534 U.S. at 120.

United States District Court
Northern District of California

This holding—coupled with the fact that Defendant was on probation for committing a not necessarily violent but serious offense of possession of stolen property with gang enhancements—establishes that Chavez had a low expectation of privacy. Indeed, Chavez's legitimate privacy interests at the time of the August 19, 2012 search were less substantial than Chavez's privacy interests at the time of the May 22, 2011 search.

## 2. The Government's Interests

The Court now assesses the strength of the government's interest in conducting the August 19, 2012 search. As the Court noted previously, the strength of the governmental interest in conducting a search of a probationer "varies depending on the degree to which the government has a specific reason to suspect that a particular probationer is reoffending or otherwise jeopardizing his reintegration into the community." *Lara*, 815 F.3d at 612. Here, the government had some reason to suspect that Chavez was reoffending and jeopardizing his reintegration into the community, though the Court holds that these governmental interests were weaker than the government's interests in conducting the May 22, 2011 search.

At the outset, the Court notes that the government correctly "recognizes that there was not as much suspicion of criminal activity based on merely seeing the vehicle of a known . . . gang member, from the same clique as Chavez, parked in Chavez's driveway." Opp. at 12. Unlike Chavez's probation violation on May 22, 2011—where officers observed Chavez interacting with a parolee with gang affiliations—on August 19, 2012, officers did not actually see Chavez associating with anyone. Rather, officers observed a vehicle parked in Chavez's driveway that was occasionally driven by a documented gang member. Officers conducted a registration check and confirmed that the vehicle was registered to a relative of the documented gang member. Based on this, an officer believed that the documented gang member could have been inside Chavez's residence interacting with Chavez. Such an interaction would have violated Chavez's probation condition prohibiting associating with gang members or individuals on any form of probation or parole. Ex. 13 at 2. Officers conducted a probation search of Chavez's residence

1  shortly thereafter and recovered three large flat screen televisions and a PlayStation 3 video game

2  console that officers suspected were stolen.

3      Given the fact that officers did not observe Chavez violating the terms of his probation, the

4  Court cannot say that on August 19, 2012, the government's interests in preventing recidivism and

5  facilitating Chavez's reintegration into the community were as substantial or compelling as the

6  government's interests at the time of the May 22, 2011 search. Nonetheless, the government still

7  possessed legitimate interests in conducting the August 19, 2012 search. Although officers had

8  not observed Chavez interacting with a known parolee or gang member or otherwise violating the

9  terms of his probation agreement, the government had some reason to suspect that Chavez was

10  violating the conditions of his probation because a vehicle occasionally driven by a documented

11  gang member was parked in his driveway.

12      Additionally, the government argues that because Chavez had committed his crime of

13  possession of stolen property while in home confinement, the government had a stronger interest

14  in supervising Chavez and preventing further recidivist activity. Opp. at 12. The Court agrees.

15  *See United States v.* Aviles, 229 F. Supp. 3d 1039, 1046 (N.D. Cal. 2017) ("The government's

16  interest . . . was heightened by [defendant's] circumstances," which included prior instances of

17  recidivism while on probation.).

18      Therefore, although the government's interests justifying the August 19, 2012 search were

19  not as substantial as those supporting the earlier May 22, 2011 search, the governmental interests

20  were legitimate.

21      **3.  Balancing Chavez's Privacy Interests Against the Government's Interests**

22      The Court must now balance Chavez's legitimate privacy interests against the

23  government's interests in conducting the search.

24      The Court recognizes that the government's interest in preventing any recidivist acts and in

25  facilitating Chavez's reintegration into the community are legitimate but not nearly as substantial

26  as the government's interest in the May 22, 2011 search where officers observed Chavez violate

27

28

Case No. 15-CR-00285-LHK-1
ORDER DENYING MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE MAY 22, 2011 AND AUGUST
19, 2012 SEARCHES OF CHAVEZ'S RESIDENCE

the terms of his home confinement. Nonetheless, the government did have legitimate interests in investigating Chavez on August 19, 2012 given his prior recidivist acts while in home confinement.

At the same time, however, Chavez's legitimate expectation of privacy at the time of the August 19, 2012 search was also weaker than his expectation of privacy at the time of the May 22, 2011 search. At the time of both searches, Chavez's expectation of privacy was "significantly diminished" because Chavez was subject to clear and unambiguous search conditions that permitted searches of his residence without any reasonable suspicion whatsoever. *See Knights*, 534 U.S. at 120 (a clear and unambiguous search condition "significantly diminish[s] [a defendant's] reasonable expectation of privacy"); *Bravo*, 43 Cal. 3d at 611 ("[A] search condition of probation that permits a search without a warrant also permits a search without 'reasonable cause.'"); *King*, 736 F.3d at 809 ("[A]cceptance of a clear and unambiguous search condition 'significantly diminished [a defendant's] reasonable expectation of privacy." (quotation marks omitted)). Nonetheless, Chavez's legitimate expectation of privacy was weaker at the time of the August 19, 2012 search because Chavez's offense of possessing stolen property with gang enhancements—which placed him on probation on August 19, 2012—was more serious than the non-violent misdemeanor driving offense that placed Chavez on home confinement on May 22, 2011.

In light of the facts and the totality of the circumstances, the Court concludes that even though the government had only legitimate (as opposed to compelling) interests in conducting the August 19, 2012 search, Chavez's significantly diminished expectation of privacy did not render the search unreasonable.

As before, the Court again notes that the Ninth Circuit held in *Lara* that searches of nonviolent probationers may be constitutionally unreasonable. 815 F.3d at 612. But again, *Lara* does not control this case because in *Lara*, "[n]one of [the search condition's terms]—in particular, neither 'container' nor 'property'—clearly or unambiguously encompasse[d] [a] cell

19

phone and the information contained therein." *Id.* at 610. The defendant had not "clearly and unambiguously consented to the cell phone search at issue," and therefore, the *Lara* defendant's privacy interest was only "somewhat diminished" on account "of his status as a probationer." *Id.* at 612.

Here, the opposite is true. Chavez had consented to a clear and unambiguous search condition permitting suspicionless searches of Chavez's residence. As the United States Supreme Court and the Ninth Circuit have repeatedly noted, when a defendant consents to a clear and unambiguous search condition, that defendant has a "significantly diminished" expectation of privacy, which weighs strongly in favor of finding a search reasonable.[4] *Knights*, 534 U.S. at 120; *see King*, 736 F.3d at 809 ("[A]cceptance of a clear and unambiguous search condition 'significantly diminished [a defendant's] reasonable expectation of privacy." (quotation marks omitted)). Thus, the Court holds that *Lara* presents facts different from the instant case such that under the totality of the circumstances, the August 19, 2012 did not violate the Fourth Amendment.

Accordingly, the Court holds that in light of the totality of the circumstances, the August 19, 2012 search of Chavez's residence did not violate the Fourth Amendment because Chavez's privacy interests were outweighed by the government's interest in conducting a probationary search pursuant to a clear and unambiguous search condition.

## III. CONCLUSION

For the foregoing reasons, the Court DENIES Chavez's motion to suppress evidence obtained directly or indirectly from the May 22, 2011 and August 19, 2012 searches of his residence.

---

[4] Indeed, one district court has held that under the totality of the circumstances, searches are generally reasonable when carried out pursuant to a valid, unambiguous search condition permitting suspicionless searches. *See Aviles*, 229 F. Supp. 3d at 1042 ("[A]s a practical matter, at least in cases where the search conducted by the officer clearly falls within the scope of the search condition, the inquiry typically begins and ends with an assessment of the validity of the search condition imposed by the sentencing judge.").

20

**IT IS SO ORDERED.**

Dated: January 31, 2020

_Lucy H. Koh_
_____
LUCY H. KOH
United States District Judge

Case No. 15-CR-00285-LHK-1
ORDER DENYING MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE MAY 22, 2011 AND AUGUST
19, 2012 SEARCHES OF CHAVEZ'S RESIDENCE